Rosenblatt, J.
(concurring). Although the parties have not indicated whether the jury’s $50 million total verdict is among the highest ever awarded in a negligence casé, it is surely among the higher personal injury verdicts in our state’s history. There is no denying the heartbreaking nature of Samuel’s injuries, and the jury was understandably impressed by the moving and abundant proof as to how he will have to live over the course of his life.
Based on the expert testimony at trial, the jury calculated that in light of his condition Samuel would be expected to live for another 55 years. In arriving at a figure of $50 million for his care, the jury, as instructed, took into account the projected impact of inflation. Put differently, the jury concluded, in effect, that if there were no inflation it would take roughly $12 million to “compensate” for the expected loss. (I say “compensate” in the legal sense. To the minds of most people, there is no amount of money that can compensate for these injuries.) By adding the inflation factor (ostensibly 3.335%), the jury arrived at the sum of $50 million.
I write separately to point out that although the jury determined that $50 million is the apt figure after inflation, CPLR article 50-A comes into play and further enlarges the judgment — nearly threefold — to approximately $140 million. It is difficult to imagine that the jury would have awarded $12 million and extrapolated it to $50 million (by taking into account the projected inflation factor) if it knew that the verdict would actually amount to a payout of about $140 million. It is equally difficult to imagine that the Legislature could have *175 easily predicted that article 50-A (as later interpreted*) would lead to this extraordinary level of compensation. And yet that is what the statute seems to require for all cases like the one before us.
This appeal tests the separation of powers doctrine to its limits. It would have been easy enough for a less dutiful court to ignore the words of the statute and apply its own methodology, reasoning that the Legislature could not possibly have intended this result. The Court, however, has not done that. Instead, and commendably, it applies article 50-A out of fidelity to the literal legislative language. I concur because the result (when the statute is read in combination with Schultz and Bryant) seems inescapable. Once Schultz held that the four percent additur was to be calculated on top of the jury’s projected rate of inflation, the die was cast. From that point, structured judgments took on the prospect of damage awards in excess of plaintiffs’ damages. The case before us, however, dramatically demonstrates the ultimate and extreme consequences that may well have been beyond the Legislature’s intentions. Unless the Legislature amends the statute, awards will be comparably enlarged in all personal injury cases of this type.
When jury awards are substantially lower than here, the application of article 50-A does not result in this degree of expansion. By the unstinting application of article 50-A, the effects of the structured judgment provisions will be most keenly felt — and will produce the levels of payouts we have here— when applied to verdicts that award plaintiffs millions of dollars. This will happen because article 50-A requires that the average annual award, in future dollars, be taken as the first year’s calculation (see Bryant, 93 NY2d at 603-604). It thus gives plaintiffs the benefit of inflation in year one, where the actual effects of inflation are necessarily at their lowest. Furthermore, the statute compounds this by seemingly requiring the addition of yet another four percent to the already ballooned initial figure (see Schultz, 90 NY2d at 319-320). Resultingly, a plaintiff with injuries declared to be worth $12 million is to be paid $140 million.
The Attorney General of the State of New York and the New York City Corporation Counsel call this unpalatable. They implore the Court to read the statute in a way that will avert *176 what they characterize as systematic and extensive overcompensation involving payouts that run into the hundreds of millions of dollars.
By way of amicus, the Attorney General asks us to reject plaintiffs position because, like the City, the State is sued in thousands of personal injury and wrongful death actions each year, and because “the State has an interest in ensuring that medical malpractice insurance premiums do not increase to a level that might impair its citizens’ access to affordable, high-quality medical care.” Quoting Rohring v City of Niagara Falls (84 NY2d 60, 67 [1994]), the State argues that “[p]laintiffs are entitled to be made whole * * * but have no right to overcompensation,” i.e., compensation for expected losses “well in excess of plaintiffs’ actual losses.”
The Attorney General candidly tells us that a literal reading of the key statutory provision supports plaintiffs’ interpretation, but argues that the $140 million result would frustrate the legislative purpose, which is to compensate adequately, not to triple a verdict that cannot by any measure be considered inadequate at $50 million.
The City is no less forceful in its thrust. It importunes the Court to repudiate the methodology that has produced this judgment because it places “an unwarranted financial burden on tort defendants, such as the City, HHC, and New York Hospital.” The City terms the methodology unconscionable, because it “grossly overcompensates plaintiffs rather than awarding actual proven losses with reasonable allowances for time” and that “[b]ecause of such overcompensation, insurance companies charge high fees for annuity contracts to fund structured judgments.” According to the City and the State, the operation of the statute defeats one of its primary purposes — which was to reduce rather than increase insurance costs.
The City illustrates this point by listing a number of cases in which large verdicts have been rendered against it (and its Health and Hospitals Corporation), and argues that the strict application of article 50-A will carry serious financial consequences in the form of increasingly greater and unprecedented payouts in tort cases.
Potent as these arguments may be, they ask too much of us. As judges, it is not for us to pick up the legislative pen and rewrite the statute. Given the landscape before us, it is for the Legislature, and not the Court, to act on these grievances if it *177 sees fit, knowing now what it could not have readily forecast when it enacted the measure.
The City and State have made cogent assertions, contending that the Legislature did not likely conceive of a result so far out of line with accepted standards of compensation. The Legislature is best suited to vindicate that position. This is the most efficient approach and the one most faithful to our respective roles and duties.

 See Bryant v New York City Health & Hosps. Corp. (93 NY2d 592 [1999]); Schultz v Harrison Radiator Div. Gen. Motors Corp. (90 NY2d 311 [1997]).